William Thorpe (No. 005641)
wthorpe@thorpeshwer.com
Bree G. Nevarez (No. 035671)
bnevarez@thorpeshwer.com
THORPE SHWER, PC
3200 North Central Avenue, Suite 1560
Phoenix, AZ 85012
Telephone: 602-682-6105

Lisa N. Neal (*Pro Hac Vice Application Forthcoming*)
lneal@rutan.com
James R. Burrell (*Pro Hac Vice Application Forthcoming*)
jburrell@rutan.com
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Telephone: 714-641-5100

Hani Z. Sayed (*Pro Hac Vice Application Forthcoming*)
hsayed@rutan.com
RUTAN & TUCKER, LLP
16427 N. Scottsdale Road, Suite 260
Scottsdale, AZ 85254
Telephone: 714-641-5100

Attorneys for Plaintiff IDIQ

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Identity Intelligence Group, LLC, a Nevada Limited Liability Company, d/b/a IDIQ, <br><br> Plaintiff, <br><br> vs. <br><br> Rocket Mortgage, LLC, a Michigan Limited Liability Company, <br><br> Defendant. | Case No. _____ <br><br><br> **COMPLAINT** |

Plaintiff Identity Intelligence Group, LLC dba IDIQ ("Plaintiff" or "IDIQ"), by and through its attorneys, Rutan & Tucker, LLP and Thorpe Shwer, PC, for its Complaint against Rocket Mortgage, LLC ("Defendant" or "Rocket Mortgage"), alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

## NATURE OF THE CASE

1.      IDIQ initiates this action to recover the web domain <rocketcreditscores.com> (the "Disputed Domain") under 15 U.S.C. § 1114(2)(D)(iv)-(v) following Defendant's bad-faith efforts to take the Disputed Domain from IDIQ using a Uniform Domain Name Dispute Resolution Policy ("UDRP") proceeding. IDIQ seeks to establish that it has not engaged in cyberpiracy or cybersquatting with the Disputed Domain and that IDIQ's registration and use of the Disputed Domain does not infringe upon Defendant's trademarks.

2.      Defendant does not have a trademark identical to the Disputed Domain. Instead, Defendant asserts that the commonly-used word "rocket" is the "distinctive part" of its trademarks and implies that any domain name including the word "rocket" infringes upon its trademarks. Defendant's efforts to apply its trademarks so broadly represents overreach in the extreme.

3.      Standing alone, the word "rocket" is common, generic, and not distinctive. From the source of the red glare over Baltimore harbor as witnessed by Francis Scott Key in 1814, to the NBA basketball team located in Houston, Texas; from the terror of V2s flying over 1944 London, to the awe of the Apollo moon landings; the word "rocket" refers to many different things. Frequently used as a descriptive word, exactly what and how "rocket" describes something can vary widely. Someone in the field of rocket science is considered synonymous with someone who is highly intelligent. On the other hand, rockets can indicate danger and even recklessness. A popular song may rocket to the top of the charts; a zippy car may take off like a rocket; enemy territory may be rocketed in battle; a train may rocket by bystanders; astronauts may be rocketed into space; and gasoline prices may rocket unexpectedly.

4.     On its own, "rocket" can mean almost anything. Any meaningful use of the word in a commercial context must consist of the combination of the word "rocket" and other words around it. Accordingly, any trademark in this vein must be narrow in scope and applicability.

5.     Nevertheless, Defendant attempted to bully IDIQ into handing over the Disputed Domain based merely on the presence of word "rocket" within the Disputed Domain. When IDIQ sent a letter walking through a legal analysis that concluded there was not likely confusion with the Disputed Domain, Defendant grew impatient and filed a UDRP complaint with the World Intellectual Property Office ("WIPO") in an effort to take the Disputed Domain for itself.

6.     Largely relying upon Defendant's unsupported claims and knowing misrepresentations, the WIPO panel decided against IDIQ and ordered the Disputed Domain to be transferred to Defendant.

7.     Plaintiff seeks declaratory relief and injunctive relief in the form of having the Disputed Domain returned. In light of Defendant's bad faith actions, Plaintiff also seeks damages as well as reasonable costs and attorneys' fees.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action as a federal question pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1114(2)(D)(v), and 15 U.S.C. § 1114(2)(D)(iv); this Court also has subject matter jurisdiction over this action as a request for federal declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     This Court has personal jurisdiction over Defendant because Defendant initiated an administrative proceeding against Plaintiff and the Disputed Domain pursuant to the UDRP, in which Defendant submitted to this Court's jurisdiction.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the property that is the subject of this action is situated in this District, specifically the Disputed Domain. Moreover, venue is proper in this District due to Defendant's voluntary submission to this Court when Defendant filed its UDRP complaint

with the WIPO arbitration and mediation center concerning the Disputed Domain.

## THE PARTIES

11.     Plaintiff, Identity Intelligence Group, LLC dba IDIQ, is a limited liability company formed under the laws of the state of Nevada and has its principal place of business in Temecula, California. IDIQ specializes in offering credit monitoring and identity theft protection services to consumers.

12.     Upon information and belief, Defendant, Rocket Mortgage, LLC, is a limited liability company formed under the laws of the state of Michigan and has its principal place of business in Detroit, Michigan. Upon information and belief, Rocket Mortgage offers mortgage loans to consumers.

## FACTS

**A.     Background**

13.     For twelve years and counting, IDIQ has been at the forefront of providing consumers with credit monitoring and identity theft protection services. One of the fastest growing companies in its industry, IDIQ provides its state-of-the-art services directly to consumers through various brands and websites.

14.     As a leader in its industry, IDIQ is continually innovating. IDIQ began partnering with affiliates who utilize IDIQ's platform to offer IDIQ's credit monitoring and identity theft protection services to the affiliates' clients. For example, some employers now offer IDIQ services as an employee benefit. Another recent IDIQ service allows renters to report rental payments to credit bureaus so that renters may establish and build credit by simply paying rent.

15.     On or about October 25, 2020, IDIQ registered the Disputed Domain with internet domain registrar GoDaddy, LLC (the "Registrar").

16.     IDIQ selected the Disputed Domain name <rocketcreditscores.com> to project the visual image of rapidly increasing credit scores. In other words, IDIQ employs the word "rocket" as a compelling synonym for "boost." IDIQ did not consider Defendant or any other company when devising the Disputed Domain.

17.     IDIQ reasonably believed it had every legal right to register and use the Disputed Domain. For one thing, neither Defendant nor anyone else had a registered trademark for <rocketcreditscores.com>. And while Defendant had a registered trademark in the form of Rocket Mortgage and operated its website at <rocketmortgage.com>, many other companies had registered trademarks and/or owned domain names containing the word "rocket," such as Rocket Lawyer, Rocket League, RocketTrade, Rocket Wallet, Rocket Licensing, Rocket Registration, and RocketInvoice. Even the domain name <rocket.com> is not registered or used by Defendant, but rather is registered and used by Aerojet-General Corporation.

18.     Shortly after registering the Disputed Domain (and no later than February 2, 2021), IDIQ began operating a website on the Disputed Domain, through which IDIQ offers credit monitoring and identity theft protection services to consumers.

**B.     Threats by Rocket Mortgage**

19.     On or about February 1, 2022, Defendant, through counsel, sent a letter to IDIQ wrongfully accusing IDIQ of infringing Defendant's trademarks and demanding that IDIQ cease using the Disputed Domain (the "February 1 Letter").

20.     Defendant's February 1 Letter was the first time IDIQ received anything from Defendant concerning the Disputed Domain even though IDIQ had used the Disputed Domain for over a year by that time.

21.     On or about March 8, 2022, IDIQ, through counsel, responded to the February 1 Letter and informed Defendant that IDIQ was investigating the matter and would follow up after its investigation.

22.     On or about March 25, 2022, Defendant, through counsel, sent another letter to IDIQ reiterating its accusations of trademark infringement and demanded a "substantive response" to Defendant's claims.

23.     On or about April 7, 2022, IDIQ, through counsel, sent a detailed letter to Defendant explaining that Defendant's trademarks were narrow in scope and demonstrating that there was no likelihood of confusion between the Disputed Domain and

1  Defendant (the "April 7 Letter").

2       24.     Despite IDIQ's good-faith efforts to engage in a dialogue with Defendant to

3  resolve any concerns, Defendant never responded to the April 7 Letter.

4       **C.    UDRP Proceeding**

5       25.     Defendant quickly escalated the dispute with an administrative proceeding

6  designed to take the Disputed Domain. On or about May 20, 2022, Defendant filed a

7  complaint with WIPO pursuant to the UDRP (the "UDRP Complaint") seeking to have the

8  Disputed Domain transferred from IDIQ to Defendant on the basis of alleged

9  cybersquatting.

10      26.     This complaint began a UDRP proceeding, WIPO Case Number D2022-

11 1840, to determine the future of the Disputed Domain (the UDRP Proceeding). The UDRP

12 Proceeding would be decided by a single WIPO panelist.

13      27.     On or about June 20, 2022, IDIQ submitted its response in the UDRP

14 Proceeding, in which IDIQ denied that it engaged in cybersquatting and asserted that it

15 registered and used the Disputed Domain in good faith under a reasonable belief that doing

16 so was not unlawful.

17      28.     Four days later, without solicitation by the WIPO panel and in violation of

18 the UDRP rules, Defendant submitted a 9-page supplemental filing. In its supplemental

19 filing, Defendant not only accused IDIQ of acting in bad faith, but actually accused IDIQ

20 of perpetrating a scam on consumers. Defendant offered no supporting evidence that IDIQ

21 was engaging in any illegal activity.

22      29.     As a respected credit monitoring and identity theft protection company, IDIQ

23 does not "scam" consumers and does not engage in illegal activity. In fact, IDIQ is

24 accredited with the Better Business Bureau where it has an A- rating.

25      30.     In response to Defendant's June 24 submission, IDIQ submitted its own

26 supplemental filing on or about July 1, 2022, in which IDIQ argued that supplemental

27 filings were improper under the UDRP and should not be considered. Nevertheless, IDIQ

28 believed it needed to respond to Defendant's outrageous and false accusations.

31.     On or about July 14, 2022, the WIPO panel issued its decision in the UDRP Proceeding in the form of a written document dated July 7, 2022 (the "UDRP Decision"). A true and correct copy of the UDRP Decision is attached hereto as **Exhibit A**.

32.     The UDRP Decision was in favor of Defendant, and it directed the Registrar to transfer the Disputed Domain to Defendant.

33.     On or about July 15, 2022, the Registrar confirmed via email that it had received a copy of the UDRP Decision and was taking steps to transfer the Disputed Domain to Defendant.

34.     According to UDRP policy, IDIQ was given ten business days from the date the UDRP Decision was issued to file an action with this Court and pause the transfer of the Disputed Domain.

35.     Faced with no alternatives, IDIQ initiates this action to recover the Disputed Domain, and IDIQ seeks declaratory judgment from the Court confirming that IDIQ's registration and use of the Disputed Domain is not unlawful.

## FIRST CAUSE OF ACTION

**Declaration Under Anti-Cybersquatting Consumer Protection Act**

**(15 U.S.C. § 1114(2)(D)(v))**

36.     Plaintiff hereby realleges and incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

37.     The Anti-Cybersquatting Protection Act ("ACPA") provides relief to domain name registrants who have their domain name wrongfully transferred in a UDRP proceeding initiated by overzealous, overreaching trademark owners.

38.     15 U.S.C. § 1114(2)(D)(v) provides that: "A domain name registrant whose domain name has been suspended, disabled, or transferred under a [UDPR proceeding] may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant."

39.     IDIQ registered the Disputed Domain name using domain registrar GoDaddy, LLC on or about October 25, 2020 and has used the Disputed Domain since that time, making IDIQ the domain name registrant of the Disputed Domain.

40.     On or about June 14, 2022, Defendant filed the UDRP Complaint with WIPO, in which Defendant wrongfully accused IDIQ of cybersquatting in order to have the Disputed Domain transferred from IDIQ to Defendant.

41.     Citing to Defendant's misstatements and unfounded accusations, the WIPO panel issued its UDRP Decision in favor of Defendant on or about July 14, 2022.

42.     In adherence to the guidelines of the UDRP, the UDRP Decision ordered the Registrar to transfer the Disputed Domain to Defendant.

43.     In response to the erroneous UDRP Decision, IDIQ was forced to file this action with the Court to recover the Disputed Domain.

44.     By filing this action within ten business days of the issuance of the UDRP Decision, IDIQ may be able to pause the transfer of the Disputed Domain pending the outcome of this case.

45.     In ACPA actions that refer to UDRP proceedings, Courts decide the issue de novo; no deference is given to the WIPO panel's decision or reasoning.

46.     Defendant is the trademark owner who initiated the UDRP proceeding. By virtue of being named as the Defendant in this Complaint, Defendant has notice of this civil action to stop the hijacking of the Disputed Domain in the form of service of this Complaint.

47.     The Disputed Domain is not identical to any mark owned by Defendant.

48.     The Disputed Domain is not confusingly similar to any mark owned by Defendant.

49.     Defendant's marks are not famous.

50.     Defendant's marks are weak and narrow in scope. The marks owned by Defendant consist of a common word with many connotations (i.e., rocket) followed by a general descriptor of the service offered (e.g., mortgage loans), making Defendant's marks

1  narrow and applicable only when all of the words are together.

2      51.    Defendant has asserted that the word "rocket" is the "distinctive part" of its

3  trademark. This suggests Defendant believes that anything containing the word "rocket" is

4  covered by Defendant's trademark. However, due to its numerous possible definitions and

5  compelling imagery, the word "rocket" is used by many companies throughout the United

6  States in company names, brands, and products.

7      52.    IDIQ believed, and had reasonable grounds to believe, that its registration of

8  the Disputed Domain was lawful. The Disputed Domain is not identical to any mark, and

9  the term "rocket" is a commonly-used word that can function either as a noun (e.g., a

10  rocket ship) or a verb (e.g., to rocket into the sky). Because the word "rocket" signifies

11  anything from intelligence (e.g., a rocket scientist) to quickness (e.g., moving with rocket

12  speed) to power (e.g., the strength of a rocket), many companies utilize the word rocket in

13  names and descriptions of products and services.

14      53.    IDIQ and Defendant offer different products and provide different services

15  from each other. IDIQ offers consumers credit monitoring and identity theft protection

16  services, while Defendant lends money to consumers in the form of mortgage loans.

17      54.    IDIQ uses the Disputed Domain to provide bona fide offerings of goods and

18  services to consumers. Indeed, IDIQ has successfully provided its credit monitoring and

19  identity theft protection services to consumers via the Disputed Domain for over a year and

20  a half.

21      55.    IDIQ never considered Rocket Mortgage when selecting and registering the

22  Disputed Domain. Instead, IDIQ chose the domain name <rocketcreditscores.com>

23  independent from the influence of any other company, product, or trademark. The word

24  rocket was chosen to apply in its verb context, as in to lift up rapidly (e.g., to rocket

25  consumers' credit scores meaning to increase the score numbers speedily, similar to how a

26  rapidly-increasing stock price might be said to have rocketed).

27      56.    At no point has IDIQ offered to sell or attempted to sell the Disputed

28  Domain.

57.     To the best of its knowledge, IDIQ has not acquired or registered any domain names that are identical or confusingly similar to the marks of others.

58.     IDIQ did not provide the Registrar with material and misleading false contact information when registering the Disputed Domain.

59.     IDIQ has not made any attempt to use the Disputed Domain to divert consumers away from Defendant or Defendant's websites.

60.     IDIQ has never attempted to disparage Defendant with its use of the Disputed Domain and has never attempted to harm the goodwill of Defendant or Defendant's marks.

61.     The events described herein warrant relief for IDIQ under 15 U.S.C. § 1114(2)(D)(v), including injunctive relief to permanently return the Disputed Domain to IDIQ.

### SECOND CAUSE OF ACTION

**Reverse Domain Name Hijacking**

**(15 U.S.C. § 1114(2)(D)(iv))**

62.     Plaintiff hereby realleges and incorporates by reference the allegations in paragraphs 1-61 as if fully set forth herein.

63.     The ACPA provides relief when overreaching trademark owners act in bad faith against a domain name registrant.

64.     15 U.S.C. § 1114(2)(D)(iv) states that "[i]f a registrar, registry, or other registration authority [transfers a domain name] based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant."

65.     Defendant initiated the UDRP Proceeding with WIPO in a bad-faith attempt

to deprive IDIQ of the Disputed Domain.

66.     Defendant made knowing and material misrepresentations to WIPO in the UDRP Proceeding.

67.     In the UDRP Proceeding, Defendant knowingly misrepresented that Defendant offers "identical and competitive" credit monitoring and identity theft protection services to IDIQ, when in fact Defendant does not offer those services. Instead, Defendant issues mortgage loans to consumers.

68.     In the UDRP Proceeding, Defendant knowingly misrepresented that consumer confusion exists between Defendant and the Disputed Domain, and that IDIQ intended to create consumer confusion. Upon information and belief, there is no consumer confusion with regard to the Defendant and the Disputed Domain. Moreover, Defendant offered no evidence or support demonstrating the existence of confusion among consumers and failed to address IDIQ's April 7 Letter explaining why there is no consumer confusion.

69.     IDIQ does not intend to confuse consumers, and Defendant offered no evidence to support its claim regarding IDIQ's intent.

70.     In the UDRP Proceeding, Defendant knowingly misrepresented that IDIQ intended to falsely suggest that IDIQ was associated with Defendant, but Defendant did not point to any statements or claims from IDIQ that it is associated with Defendant because IDIQ has never made such statements or claims. Moreover, Defendant offered no support or evidence of bad-faith intent on IDIQ's part.

71.     In the UDRP Proceeding, Defendant knowingly misrepresented that IDIQ intended to misdirect consumers to its own website for commercial gain. IDIQ has never had any intent to misdirect consumers to its website, and Defendant offered no evidence to support its claim regarding IDIQ's intent.

72.     Defendant acted in bad faith when it ignored the rules of the UDRP proceeding and submitted an unsolicited supplementary filing filled with disparaging, unsupported claims with regard to IDIQ and its use of the Disputed Domain. These included, among others, the baseless claim that IDIQ "scams" consumers.

73.     The WIPO panel relied on Defendant's representations when deciding against IDIQ and ordering the Disputed Domain transferred to Defendant.

74.     In the UDRP Decision, the WIPO panel relies on Defendant's claim to offer competing credit monitoring and identity theft protection services to reach its decision, but Defendant does not in fact offer services that compete with IDIQ.

75.     In the UDRP Decision, the WIPO panel relies on Defendant's misrepresentation that IDIQ implies that it is associated with Defendant to reach its decision, but like Defendant, the panel cites no evidence for this false claim. IDIQ does not claim to be associated with Defendant.

76.     In the UDRP Decision, the WIPO panel relies on Defendant's misrepresentation that IDIQ intends to misdirect consumers to its website to reach its decision, but the WIPO panel cites to no evidence of consumers being misdirected, let alone evidence of IDIQ's intent. IDIQ does not attempt to misdirect consumers to its website.

77.     The WIPO panel's UDRP Decision ordered the Registrar to transfer the Disputed Domain to Defendant, and the Registrar confirmed its receipt of the UDRP Decision.

78.     Based upon, and as a direct result of, Defendant's knowing misrepresentations to the WIPO panel, the WIPO panel in the UDRP Proceeding wrongfully transferred the Disputed Domain from IDIQ to Defendant by means of the Registrar.

79.     In order for IDIQ to attempt to recover its rightful property and pause transfer of the Disputed Domain pending the outcome of this action, IDIQ was forced to file this action and incur the expenses associated with this action.

80.     The events described herein constitute reverse domain name hijacking and warrant relief, damages, and attorneys' fees and costs for IDIQ under 15 U.S.C. §1114(2)(D)(iv), as well as injunctive relief to return the Disputed Domain to IDIQ.

**THIRD CAUSE OF ACTION**

**Declaration of Non-Infringement by the Disputed Domain**

**(28 U.S.C. § 2201)**

81.     Plaintiff hereby realleges and incorporates by reference the allegations in paragraphs 1-80 as if fully set forth herein.

82.     A dispute exists between IDIQ and Defendant concerning whether IDIQ's acquisition and use of the Disputed Domain infringes upon Defendant's trademarks. As a consequence of the dispute, an actual and justiciable controversy exists between Plaintiff and Defendant.

83.     Defendant has accused IDIQ of infringing Defendant's trademarks through IDIQ's registration and use of the Disputed Domain on multiple occasions, including the February 1 Letter and the UDRP Complaint.

84.     Defendant filed a UDRP complaint against IDIQ with WIPO, and the resulting decision ordered that the Disputed Domain be transferred from IDIQ to Defendant.

85.     Plaintiff seeks declaratory judgment that it is the rightful owner of the Disputed Domain and has the right to use the Disputed Domain.

86.     Plaintiff seeks declaratory judgment that the Disputed Domain does not infringe upon Defendant's marks, which are narrowly applicable.

87.     Defendant has threatened legal action related to its trademarks against IDIQ in multiple letters and has already secured the transfer of the Disputed Domain via the UDRP Proceeding. Due to Defendant's threats and actions, IDIQ has a real and reasonable apprehension that it will be subject to further litigation on this matter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment against Defendant as follows:

1.     That the Court enter judgment in favor of Plaintiff and against Defendant on each and every claim alleged herein;

2.      A declaration that Plaintiff's registration and use of the Disputed Domain is not unlawful under the ACPA;

3.      A declaration that the Disputed Domain does not infringe upon Defendant's trademarks;

4.      An order permanently enjoining the domain registrar from transferring the Disputed Domain;

5.      Damages according to proof;

6.      An award to Plaintiff of reasonable attorneys' fees and costs, pursuant to 15 U.S.C. § 1114(2)(D)(iv);

7.      Awarding Plaintiff interest, including prejudgment and post-judgment interest, on the foregoing sums;

8.      For such other and further relief as this Court may deem just and appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues raised in this Complaint that are triable by a jury.

DATED this 28th day of July, 2022.

**THORPE SHWER, PC**

By: /s/ *William L. Thorpe*

William L. Thorpe
Bree G. Nevarez

AND

**RUTAN & TUCKER, LLP**
Hani Z. Sayed (to be admitted *pro hac vice*)
Lisa N. Neal (to be admitted *pro hac vice*)
James R. Burrell (to be admitted *pro hacvice*)

*Attorneys for Plaintiff*

# EXHIBIT A



## ADMINISTRATIVE PANEL DECISION

Rocket Mortgage, LLC v. Registration Private, Domains By Proxy, LLC / Michael Scheumack, Identity Intelligence Group (IDIQ)
Case No. D2022-1840

### 1. The Parties

The Complainant is Rocket Mortgage, LLC, United States of America ("United States"), represented by Perkins Coie, LLP, United States.

The Respondent is Registration Private, Domains By Proxy, LLC / Michael Scheumack, Identity Intelligence Group (IDIQ), United States, represented by Rutan & Tucker, LLP, United States.

### 2. The Domain Name and Registrar

The disputed domain name <rocketcreditscores.com> (the "Domain Name") is registered with GoDaddy.com, LLC (the "Registrar").

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on May 20, 2022. On May 23, 2022, the Center transmitted by email to the Registrar a request for registrar verification in connection with the Domain Name.  On May 24, 2022, the Registrar transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2 and 4, the Center formally notified the Respondent of the Complaint, and the proceedings commenced on May 27, 2022.  In accordance with the Rules, paragraph 5, the due date for Response was June 16, 2022.  On June 14, 2022, the Respondent sent an email communication to the Center requesting an extension of the Response due date.  Pursuant to paragraph 5(b) of the Rules, the Response due date was extended to June 20, 2022.  The Response was filed with the Center on June 21, 2022.

The Center appointed W. Scott Blackmer as the sole panelist in this matter on June 23, 2022.  The Panel finds that it was properly constituted.  The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

The Complainant submitted a supplemental filing on June 25, 2022, and the Respondent submitted a reply on July 1, 2022, as discussed further below.

## 4. Factual Background

The Complainant is a mortgage lender organized as a limited liability company under the laws of the State of Michigan and headquartered in Detroit, Michigan, United States.  According to public online information, formed in 1985 under the name Rock Financial and then known as Quicken Loans, LLC, the Complainant changed its name in 2021 to Rocket Mortgage, LLC.  The Complainant's shares have been traded on the New York Stock Exchange since August 2020, with the symbol RKT.

In 2015, the Complainant moved its services online and launched its online digital platform under the brand ROCKET MORTGAGE, pioneering online mortgage services.  The Complainant became the largest residential mortgage lender in the United States in 2017 and remains one of the largest mortgage lenders overall in the country.  The record shows that the Complainant and its various ROCKET-branded services have received media recognition and awards including J.D. Power's highest ranking for customer satisfaction for primary mortgage origination for ten consecutive years through 2020 and highest ranking for client satisfaction in mortgage services for eight consecutive years through 2021, *Kiplinger's Personal Finance* gold award in its 2021 list of "Best Firms for Customer Service:  Mortgage Lenders", *Money.com* Best Online Lender of 2020, *The Motley Fool* 2022 recognition as "Best for" loan options and online application.  Nearly all of the leading Internet search results for the words "rocket" and "credit" together refer to the Complainant.

The Complainant operates a principal consumer website at "www.rocketmortgage.com" with a linked mobile application.  The Complainant's website attracts seven million monthly visitors, and the mobile app has been downloaded over a million times.  The Complainant's website and mobile app include certain credit-related functions relevant to mortgage lending, such as credit checks and credit information services.

The Complainant claims to have used ROCKET as a mark since 1998, although the examples furnished in the record show that the Complainant tends to use the word in conjunction with other words or abbreviations such as "mortgage", "loan", "home", and "hq".  In 2017, the Complainant applied to the United States Patent and Trademark Office ("USPTO"), Serial Number 87648967, to register ROCKET as a standard character mark, on the basis of an intent to use.  USPTO issued a Notice of Allowance for this mark on March 8, 2022, giving the Complainant six months to file a statement of use or request an extension to do so.  Thus, at the time of this Decision there is no evidence of a registered ROCKET mark or a sufficient record in this proceeding to show that the word ROCKET alone has acquired distinctiveness as a common law mark of the Complainant.

Nevertheless, the Complainant holds a number of ROCKET-formative United States trademark registrations, including the following:

| MARK | UNITED STATES REGISTRATION NUMBER | REGISTRATION DATE |
|---|---|---|
| ROCKETLOAN (standard characters) | 2288697 | October 26, 1999 |
| ROCKET MORTGAGE (standard characters) | 5013488 | August 2, 2016 |
| ROCKET HQ (standard characters) | 5830389 | August 6, 2019 |

| ROCKET HQ (standard characters) | 5830390 | August 6, 2019 |
| ROCKET HQ (standard characters) | 5979883 | February 4, 2020 |
| ROCKET HOMES (words and design) | 6216956 | December 8, 2020 |

The Complainant's registered ROCKET HOMES device, without color, appears as follows:



According to the Registrar's WhoIs database, the Domain Name was registered on October 25, 2020, in the name of a domain privacy service.  After receiving notice of the Complaint in this proceeding, the Registrar identified the underlying registrant as the Respondent Michael Scheumack, listing his organization as "Identity Intelligence Group (IDIQ)", with a postal address in California, United States.  Mr. Sheumack's LinkedIn page lists him as Chief Marketing Officer for IDIQ.  The Response was filed in the name of "Identity Intelligence Group, LLC dba IDIQ", which is referred to as the "Respondent" hereafter.  According to the online database operated by the Nevada Secretary of State, Identity Intelligence Group, LLC ("IDIQ") is a limited liability company established in 2010 under the laws of the State of Nevada, United States.  The Respondent operates websites at "www.idiq.com" and "www.myscoreiq.com" in addition to the website associated with the Domain Name (the "Rocket Credit Scores website").

The Respondent's Rocket Credit Scores website is headed with a logo depicting a launching rocket ship and the words, "Rocket Credit Scores Powered by mySCOREIQ®", as follows:



The website offers consumers seven-day access to their credit scores for USD 1, followed by various monthly subscription plans for access to credit scores, credit reports, credit monitoring and alerts, identity theft insurance, and related services.  Screenshots supplied with the Response show that the Respondent's Rocket Credit Scores website was associated with the Domain Name at least as early as February 2, 2021.  The Complaint attaches evidence suggesting that the Respondent uses Google keyword advertising to promote search results for all three of its websites, the Rocket Credit Scores website and the websites at "www.idiq.com" and "www.myscoreiq.com", when Internet users search on the terms "rocket", "credit", and "score" together.

The Complainant sent a cease-and-desist letter to the Respondent on February 1, 2022.  The Respondent replied with a letter asserting its rights to use the Domain Name.

The USPTO online database shows that IDIQ holds United States trademark registrations for IDIQ and MYSCOREIQ.  On August 6, 2021, the Respondent filed applications with USPTO for two trademark registrations of its rocket-launching ROCKET CREDIT SCORES composite mark, with and without color, Serial Numbers 90869027 and 90868957, respectively, claiming first use in commerce on September 1, 2020.  The USPTO issued a nonfinal office action refusing registration of those marks on February 22, 2022, partly on the ground of likely confusion with the Complainant's ROCKET HQ trademark, Registration Number 5830390.  The USPTO examiner considered the word "rocket" to be an arbitrary term that is the dominant element in both the Complainant's and the Respondent's marks.  The examiner compared the parties'

description of services:  the Respondent "providing consumer credit reports and credit scores maintained by others" and "[c]onsultation in the field of consumer credit", and the Complainant providing "credit consulting services" and "credit information services".  The examiner concluded that these are "closely related" for purposes of assessing the likelihood of confusion.  The examiner found that this similarity in services adds to the confusing similarity arising from the fact that the marks "look and sound similar and create the same commercial impression".  The Respondent may respond to this nonfinal office action within six months.


## 5. Parties' Contentions

### A. Complainant

The Complainant asserts that it has established "trademark rights in ROCKET" and that "rocket" is the distinctive portion of both the Complainant's ROCKET marks and the Domain Name.  Thus, the Complainant urges a finding of confusing similarity.

The Complainant contends that the Respondent has no permission to use the Complainant's ROCKET marks and no trademark of its own corresponding to the Domain Name.  The Respondent is known by the names "Identity Intelligence Group, LLC dba IDIQ", not "Rocket Credit Scores".  The Complainant points out that the earliest evidence of the Respondent's Rocket Credit Scores website dates from February 2021, which is long after the Complainant's claimed "common law and registered rights in the ROCKET Mark accrued".  The Complainant argues that this website cannot be considered to represent a *bona fide* commercial offering as it used a confusingly similar Domain Name to offer "identical and competitive services".

The Complainant argues for a finding of bad faith on several grounds:

The Respondent must have been aware of the Complainant's ROCKET marks when registering the Domain Name.  The marks are well established and very well known in connection with consumer lending and credit information in the United States.  The Complainant "is one of the largest mortgage lenders in the United States, millions of consumers interact with Complainant and its websites each year for the purpose of securing mortgage and other lending and credit services, and Complainant has been the recipient of extensive recognition from third party publications and organizations".

The Domain Name is confusingly similar to the Complainant's ROCKET family of marks, and the Respondent's website offers identical credit-related informational services offered by the Complainant, competing with the Complainant and disrupting its business.  Credit information and credit applications are inherently part of the mortgage lending process and part of the Complainant's business.  The USPTO examiner has recently confirmed that ROCKET CREDIT SCORES is confusingly similar to the Complainant's ROCKET marks.

The Respondent's use of the Domain Name for competing services intentionally creates confusion as to source or affiliation and diverts Internet users for commercial gain.  The Respondent compounds this effect by buying keyword ads for all three of its websites based on the search term "rocket".

### B. Respondent

The Respondent argues against the first element of the Complaint as follows:

"The disputed domain name is not confusingly similar to Complainant's asserted service marks.  As explained below, Complainant has an extremely narrow trademark claim in ROCKET.  Specifically, because of the common use of the word 'rocket' in the context of financial services, Complainant's mark is descriptive and, thus, weak.  Furthermore, the parties' marks appear visually dissimilar.  Also, the parties' services are distinct.  As Complainant acknowledges, Respondent provides credit check, credit monitoring, and identity theft protection services under its mark and via the disputed domain, while

Complainant largely provides mortgage and lending services under its ROCKET-formative marks.  In fact, ROCKET HQ is the only one of Complainant's marks registered for use in connection with any credit-related services (see U.S. Reg. No. 5,830,390), and even that mark is only registered and used in connection with informational services – not the credit check, credit monitoring, and identity theft protection services provided by Respondent.  Finally, a search engine query for neither ROCKET nor ROCKET HQ pulls up the disputed domain name, substantiating the lack of similarity.  Thus, the domain name is not confusingly similar to a service mark in which the Complainant has rights."

The Respondent contends further that the ROCKET marks are weak because the word "rocket" is commonly used in connection with various goods and services, resulting in many "rocket"-formative marks held by multiple parties, reducing the likelihood of confusion of the Domain Name with the Complainant's marks.

The Respondent claims legitimate interests in the Domain Name.  "Respondent chose the disputed domain because it correlated with 'boosting' credit."  The Respondent observes that it used the Domain Name in its business for at least a year before the UDRP dispute arose, as shown by a screen capture of the Respondent's website dated February 2, 2021, offering credit reporting and monitoring services to consumers for a monthly fee.  The Respondent attaches a spreadsheet showing monthly enrollments in its service, with up to 42,000 monthly transactions prior to the filing of the UDRP Complaint.

The Respondent denies bad faith motivation, contending that the parties are not direct competitors.  The Respondent's focus is on credit reporting and credit monitoring services, while the Complainant provides credit information only incidental to its core business of mortgage lending.  The Respondent denies any intent to disrupt the Complainant's business or engender confusion with the Complainant's marks and argues that there is no evidence of actual confusion among consumers.

The Respondent requests a finding of Reverse Domain Name Hijacking against the Complainant, arguing that any reasonable investigation would have shown that the Respondent was conducting a *bona fide,* non-competing business using the Domain Name before the dispute arose, with a Domain Name based on a word commonly used in a descriptive manner.  According to the Respondent, the "Complainant's actions show that it engaged in a Plan B case after attempting to bully Respondent into assigning the domain name to Complainant via a baseless cease and desist letter".

## 6. Discussion and Findings

Paragraph 4(a) of the Policy provides that in order to divest a respondent of a domain name, a complainant must demonstrate each of the following:

(i) the domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights;

(ii) the respondent has no rights or legitimate interests in respect of the domain name;  and

(iii) the domain name has been registered and is being used in bad faith.

Under paragraph 15(a) of the Rules, "[a] Panel shall decide a complaint on the basis of the statements and documents submitted and in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable".

### 6.1 Preliminary Matter:  Supplemental Filings

The Complainant submitted a supplemental filing replying to the Respondent's factual arguments concerning the strength of the Complainant's marks, Internet search results on the Domain Name and the Complainant's trademarks, evidence that the Respondent is known by a name corresponding to the Domain Name and offers a *bona fide* commercial service, and rebuttal evidence concerning actual or likely confusion.  The

Complainant submits that it has furnished ample evidence and argumentation to apply for relief under the Policy, and accordingly there are not grounds for a finding of Reverse Domain Name Hijacking.

The Respondent objects to the supplemental filing, arguing that there are no "exceptional circumstances" justifying such a filing, such as new evidence or unanticipated issues in the Response.  The Respondent also counters with arguments concerning each of the points raised in the Complainant's supplemental filing.

Neither the Rules nor the Supplemental Rules make provision for supplemental filings, except at the request of the panel (see Rules, paragraph 12).  Paragraph 10 of the Rules enjoins the panel to conduct the proceeding "with due expedition".  Therefore, UDRP panels are typically reluctant to countenance delay through additional rounds of pleading and normally accept supplemental filings only to consider material new evidence or provide a fair opportunity to respond to arguments that could not reasonably have been anticipated.  See WIPO Overview of WIPO Panel Views on Selected UDRP Questions, Third Edition ("WIPO Overview 3.0"), section 4.6.

The Complainant's filing does not include newly discovered material evidence, and the arguments raised in the Response are not ones that could not have been reasonably anticipated.  The factual issues surrounding third-party trademarks, Internet search results, and the Respondent's service history have been briefed by both parties and are of limited relevance in any event.  The Panel will take the supplemental filings into consideration solely for purposes of assessing the Respondent's request for a finding of Reverse Domain Name Hijacking.

### 6.2 Substantive Issues

### A. Identical or Confusingly Similar

The first element of the UDRP "functions primarily as a standing requirement" and entails "a straightforward comparison between the complainant's trademark and the domain name".  See WIPO Overview 3.0, section 1.7.

As discussed above, the Complainant refers to a common law ROCKET service mark, but this is not supported by sufficient evidence on this record (see WIPO Overview 3.0, section 1.3 for the kinds of evidence necessary to establish acquired distinctiveness and rely on an unregistered mark for purposes of the first element of a UDRP complaint).  The Panel notes that the Complainant's pending application to register ROCKET as a trademark was filed on the basis of intent to use and is still lacking a statement of use.

However, the Complainant holds several ROCKET-formative United States trademark registrations in which the term "rocket" is the first and distinctive element, as noted by the USPTO examiner quoted above and as reflected in the fact that other terms (such as "mortgage" and "homes") are disclaimed in some of the Complainant's other trademark registrations.  The Panel finds that the term "rocket" is the distinctive element in the Complainant's ROCKET-formative trademarks and is recognizable in the Domain Name, and that the Domain Name is confusingly similar also in "look and sound" to the Complainant's registered ROCKET-formative trademarks.  As usual, the top-level domain ".com" is disregarded as a standard registration requirement.  See *id.* section 1.11.2.)

The Panel concludes that the Complainant has established the first element of the Complaint.

### B. Rights or Legitimate Interests

Paragraph 4(c) of the Policy gives non-exclusive examples of instances in which a respondent may establish rights or legitimate interests in a domain name, by demonstrating any of the following:

(i) before any notice to it of the dispute, the respondent's use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a *bona fide* offering of goods or services;  or

(ii) that the respondent has been commonly known by the domain name, even if it has acquired no trademark or service mark rights;  or

(iii) the respondent is making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.

Because a respondent in a UDRP proceeding is in the best position to assert rights or legitimate interests in a domain name, it is well established that after a complainant makes a *prima facie* case, the burden of production on this element shifts to the respondent to come forward with relevant evidence of its rights or legitimate interests in the domain name.  See WIPO Overview 3.0, section 2.1.

The Complainant has established trademark rights, a lack of permissive use, and the Respondent's use of a confusingly similar Domain Name for services that compete with some of the credit information and consulting services offered by the Complainant and that are closely related to the Complainant's mortgage lending business.  Thus, the Complainant has made a *prima facie* case, and the burden of production shifts to the Respondent.

The Respondent has applied for a relevant trademark registration, but this has been refused in the first instance in an ongoing application process.  The Respondent argues instead that it has been offering a *bona fide* commercial service associated with the Domain Name and labelled "Rocket Credit Scores", beginning more than a year before this dispute arose.  The Respondent contends that it legitimately uses the word "rocket" for its dictionary sense as a verb signifying "boosting" rapidly, rather than by reference to the Complainant.  This prior commercial use of the Domain Name would satisfy the Policy, paragraph 4(c)(i), unless it appears more likely than not that the reason given is pretextual and that the Domain Name was chosen chiefly for its trademark rather than dictionary value, as the Complainant asserts.  In that case, the service offering under this name cannot be characterized as "*bona fide*" for Policy purposes.  This issue is interrelated with the assessment of bad faith and is addressed in the discussion below of the facts relevant to the third element of the Complaint.

## C. Registered and Used in Bad Faith

The Policy, paragraph 4(b), furnishes a non-exhaustive list of circumstances that "shall be evidence of the registration and use of a domain name in bad faith", including the following to which the Complainant alludes (in which "you" refers to the registrant of the domain name):

"(iii) you have registered the domain name primarily for the purpose of disrupting the business of a competitor; or

(iv) by using the domain name, you have intentionally attempted to attract, for commercial gain, Internet users to your web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of your web site or location or of a product or service on your web site or location."

The Complainant relies on its national reputation, and the fact that the Respondent offers competing or similar services relating to consumer credit, to argue that the Respondent must have been aware of the Complainant's ROCKET brand when the Respondent registered the Domain Name in October 2020.  Notably, the Respondent does not deny prior awareness of the Complainant and its ROCKET-formative marks but states that it did not "consider" the Complainant in deciding on the Domain Name, "because there are so many other companies that use 'rocket' in their names".  This is not persuasive.  The record shows that the Complainant's ROCKET-formative marks are very well known in relation to residential mortgage lending in the United States;  the services are heavily advertised and used by millions of consumers.  The ROCKET brand would be valuable in attracting consumers to a credit information website.  Checking credit scores and obtaining related credit information are inherently part of the process of house-hunting and home buying and selling.  The Complainant itself offers such services under its ROCKET HQ mark, as the USPTO examiner observed in refusing the Respondent's pending trademark application for its ROCKET CREDIT SCORES logo on the ground of confusing similarity.  Moreover, the Respondent's Rocket Credit Scores

logo, as shown above, is similar to the launching rocket device of the Complainant's registered ROCKET HOMES trademark (including in that the textual elements are italicized).

Taken together, these facts strongly suggest that the Domain Name was not selected primarily for its dictionary sense of accelerating results but for a false implication of association with the Complainant, in an effort to misdirect Internet users to the Respondent's websites for commercial gain.  The Panel finds, on this record, that the Respondent has registered and used the Domain Name in bad faith within the meaning of the Policy.  The Panel concludes that the Complainant has established the third element of the Complaint, bad faith.

The Panel also finds on these facts that the Respondent has not established a pre-existing "*bona fide*" commercial offering demonstrating rights or legitimate interests in the Domain Name for purposes of the second element of the Complaint and concludes that the Complainant prevails on the second element as well.

**D. Reverse Domain Name Hijacking**

Paragraph 15(e) of the UDRP Rules provides that, if "after considering the submissions the panel finds that the complaint was brought in bad faith, for example in an attempt at Reverse Domain Name Hijacking ('RDNH') or was brought primarily to harass the domain-name holder, the panel shall declare in its decision that the complaint was brought in bad faith and constitutes an abuse of the administrative proceeding". The Respondent has requested such a finding here.

Reverse Domain Name Hijacking is defined under the UDRP Rules as "using the UDRP in bad faith to attempt to deprive a registered domain-name holder of a domain name".  Mere lack of success of a complaint is not sufficient to find Reverse Domain Name Hijacking.  See WIPO Overview 3.0, section 4.16. A finding of RDNH is warranted, for example, when a panel finds that the complainant (especially one represented by counsel) should have recognized that it could not succeed on one of the three elements of the complaint under any fair interpretation of the available facts or brings a complaint based "on only the barest of allegations without any supporting evidence" (*id.*).

The Panel in this instance has concluded that the Complaint is well grounded, and the Respondent's request for a finding of Reverse Domain Name Hijacking is therefore denied.

**7. Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the Domain Name, <rocketcreditscores.com>, be transferred to the Complainant.

*/W. Scott Blackmer/*
**W. Scott Blackmer**
Sole Panelist
Date:  July 7, 2022